UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **ELLIOT KAPLAN**,<br>Individually,<br>and<br>**ELLIOT KAPLAN** and **JEANNE KAPLAN**,<br>Husband and Wife,<br>2620 West 171st Street<br>Stillwell, KS 66085<br><br>      Plaintiffs,<br><br>v.<br><br>**MAYO CLINIC**<br>**MAYO FOUNDATION**<br>**MAYO FOUNDATION FOR MEDICAL**<br>   **EDUCATION AND RESEARCH**<br>**MAYO ROCHESTER, INC.**<br>**MAYO CLINIC ROCHESTER, INC.**<br>200 First Street, SW<br>Rochester, MN 55905,<br><br>**LAWRENCE J. BURGART**<br>c/o Mayo Clinic<br>200 First Street, SW<br>Rochester, MN 55905,<br><br>**DAVID NAGORNEY**<br>c/o Mayo Clinic<br>200 First Street, SW<br>Rochester, MN 55905,<br><br>      Defendants. | Case No. 07cv3630 JRT/FLN<br>Honorable JRT/FLN |

## COMPLAINT AND JURY DEMAND

Plaintiffs, ELLIOT KAPLAN and JEANNE KAPLAN, for their causes of action against Defendants, state:

### THE PARTIES

1.   Plaintiff ELLIOT KAPLAN (hereinafter referred to as "MR.. KAPLAN") resides at 2620 West 171st Street, Stillwell, KS 66085.



FILED
AUG 0 6 2007
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED _____
DEPUTY CLERK'S INITIALS _____
15 pg N/C

2. Plaintiff JEANNE KAPLAN (hereinafter referred to as "MRS. KAPLAN") resides at 2620 West 171st Street, Stillwell, KS 66085 and at all times relevant was the wife of MR. KAPLAN.

3. Upon information and belief and at all times referred to in this Complaint Defendants MAYO FOUNDATION, MAYO CLINIC, MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, MAYO ROCHESTER, INC. and MAYO CLINIC ROCHESTER, INC are corporations (or other legal entities) organized and existing under the laws of the State of Minnesota, having their principal places of business in Rochester, MN (collectively "MAYO").

4. Upon information and belief, MAYO has held itself out as a hospital duly qualified and capable of rendering excellent medical care, treatment and services to the public and for such purposes hired doctors, nurses and attendants and other personnel; has represented that physicians, residents, interns, nurses, radiologists, technicians and other medical personnel in its employ or on its staff were qualified and capable of rendering emergency, medical, health care treatment, radiological, anesthesiology and surgical services in accordance with good and accepted standards of medical and hospital practice; was the employer of BURGART and NAGORNEY identified in paragraphs 5 and 6 herein; has rendered medical services to MR. KAPLAN; and is doing business within this Court's jurisdiction, and/or has transacted business and committed tortious acts within this State out of which Mr. and Mrs. Kaplan's causes of action arise.

5. Upon information and belief and at all times referred to in this Complaint, Defendant LAWRENCE J. BURGART, M.D. ("DR. BURGART"), was an employee and "Chair, Division of Anatomic Pathology" at MAYO and licensed to practice medicine in

the State of Minnesota, has engaged in the practice of pathology and was treating MR. KAPLAN during the period of July-September 2003; was affiliated with, a member of, and employed by MAYO as part of its staff with privileges to use its facilities; has rendered medical services to MR. KAPLAN; and is doing business within this Court's jurisdiction, and/or has transacted business and committed tortious acts within this State out of which Mr. and Mrs. Kaplan's causes of action arise. DR. BURGART is a citizen and resident of the State of Minnesota.

6. Upon information and belief and at all times referred to in this Complaint, Defendant DAVID NAGORNEY ("DR. NAGORNEY"), was an employee of MAYO and licensed to practice medicine in the State of Minnesota, has engaged in the practice of surgery and was treating MR. KAPLAN during the period of July-September 2003; was affiliated with, member of and employed by MAYO as part of its staff with privileges to use its facilities; has rendered medical services to MR. KAPLAN; and is doing business within this Court's jurisdiction, and/or has transacted business and committed tortious acts within this State out of which Mr. and Mrs. Kaplan's causes of action arise. DR. NAGORNEY is a citizen and resident of the State of Minnesota.

## JURISDICTION

7. The matter in controversy herein exceeds the sum or value of $75,000 and the Court has subject-matter jurisdiction herein pursuant to 28 U.S.C. §1332.

8. Venue is proper herein pursuant to 28 U.S.C. §1391(a).

## FACTS

9. On or about July 28, 2003, MR. KAPLAN was hospitalized in Missouri complaining of abdominal pain.

3

10. After being examined by a number of physicians it was decided that a biopsy of MR. KAPLAN'S pancreas should be performed.

11. On or about July 31, 2003, a guided pancreatic biopsy was performed at MENORAH without complication.

12. On or about August 1, 2003, MR. KAPLAN, agreed that in the event of a positive needle biopsy of the pancreatic head lesion that he would be referred to MAYO.

13. Thereafter, MR. KAPLAN was informed that the biopsy was positive and was referred to MAYO.

14. On or about August 5, 2003, MR. KAPLAN wrote to DR. NAGORNEY who was the surgeon employed by MAYO assigned to MR. KAPLAN, wherein MR. KAPLAN explained his concerns about PATHOLOGY REPORT 1 and drew DR. NAGORNEY's attention to the weakness of the diagnostic statement as well as his prior history which might have explained his condition.

15. MR. KAPLAN later spoke with DR. NAGORNEY and understood that DR. NAGORNEY was aware of his concerns over the weakness of the diagnostic statement that he had cancer. DR. NAGORNEY, both individually and on behalf of MAYO, promised MR. KAPLAN that he would insure that he and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise.

16. Upon information and belief, notwithstanding MR. KAPLAN's letter of concern and warning, DR. NAGORNEY, both individually and on behalf of MAYO, did not communicate MR. KAPLAN's concerns to his colleagues at MAYO, did not insist that MAYO perform its own biopsy, or create its own slides from the specimens provided to DR. BURGART or take any of the other steps that MR. KAPLAN was told

4

and reasonably expected that DR. NAGORNEY would take to insure that the diagnosis of his condition was correct.

17. On or about August 7, 2003, four slides and two blocks comprising the biopsy specimen were provided to DR. NAGORNEY.

18. Upon information and belief sometime between August 7, 2003 and August 11, 2003, DR. BURGART examined the core biopsy specimen and a diagnosis of "infiltrating grade 2 (of 4) adenocarcinoma" was rendered (hereinafter referred to as "PATHOLOGY REPORT 2").

19. That diagnosis was well below the standard of care for pathology practice.

20. Dr. NAGORNEY instructed MR. and MRS. KAPLAN that the cancer was very aggressive; that it had progressed, already, to an advanced stage; that if the cancer progressed further, surgery would not be an option, and therefore, that surgery should be performed immediately without further testing, study, analysis, or review. On or about August 14, 2003, DR. NAGORNEY operated on Mr. Kaplan and an abdominal exploration was performed which displayed no evidence of cancer, however, DR. NAGORNEY elected to perform a Standard WHIPPLE Resection (hereinafter referred to as the "WHIPPLE").

21. During that surgery DR. NAGORNEY took additional sections of MR. KAPLAN'S pancreas for pathological examination which, when examined by Dr. Lori Erickson, showed no evidence of any cancer (hereinafter referred to as "PATHOLOGY REPORT 3").

22. Notwithstanding Dr. Erickson's diagnosis, DR. NAGORNEY continued to perform the WHIPPLE procedure.

5

23. In general terms, the WHIPPLE procedure is a highly invasive procedure that involves removing the head of the pancreas that shares its blood supply with the first part of the small intestine. The first part of the small intestine is also removed along with the gallbladder, part of the bile duct and one-half of the stomach. Reconstructive surgery is then performed, connecting the small intestine to the remaining pancreas, the bile duct, and the stomach. The WHIPPLE procedure usually takes between 6 and 8 hours to perform. When used in the treatment of cancer, the Whipple operation has a high complication rate of 30 - 40 percent and a high mortality rate during the surgery itself. Because of the highly invasive nature of this procedure, and the high complication and mortality rates, the WHIPPLE procedure should only be performed as a last resort to other forms of treatment. Mr. Kaplan was told that his chances of living beyond successful surgery was 15%.

24. Several days after DR. NAGORNEY operated on MR. KAPLAN, MR. KAPLAN was advised by MAYO that he never had cancer and that THE WHIPPLE procedure he had been subjected to was unnecessary and that PATHOLOGY REPORTS 1 and 2 reporting the diagnosis of his condition were totally incorrect.

25. MR. KAPLAN has experienced serious complications as a result of the surgery performed on him at MAYO by DR. NAGORNEY (individually and on behalf of MAYO) and has and continues to experience severe pain and physical and psychological damage which continues to beset him.

26. MR. KAPLAN has continued to undergo months of physical therapy and as a result of DEFENDANTS' acts is permanently and seriously disabled, has recurring health problems and is unable to continue to pursue his career.

27. But for the foregoing, the PLAINTIFFS would not have suffered the damage alleged herein.

28. Mayo has consistently refused to provide MR. KAPLAN with information about his treatment.

## COUNT I: MEDICAL MALPRACTICE

29. PLAINTIFFS' repeat and reallege each and every allegation in paragraphs 1 through 28 with the same force and effect as though fully set forth herein.

30. DEFENDANTS, their agents, servants and employees represented themselves to be competent to perform and render all professional work, labor, services, treatments and tests that were to be rendered to MR. KAPLAN.

31. DEFENDANTS, their agents, servants and employees represented that they had the skill, knowledge and ability generally possessed by persons specializing in such type of treatment and practicing their profession in the performance of tests and all diagnosis, preoperative, operative and postoperative procedures.

32. During the period of July through September 2003, MR. KAPLAN employed DEFENDANTS, for compensation, to render medical services to him.

33. During the period of July through September 2003, DEFENDANTS by their agents, servants or employees examined and undertook medical care of MR. KAPLAN.

34. During the period of July through September 2003, DEFENDANTS, their agents, servants or employees carelessly and negligently failed to diagnose MR. KAPLAN's complaints.

35. In rendering services to MR. KAPLAN, DEFENDANTS violated their duty to him and were negligent among other things, in carelessly, negligently, wrongfully and improperly failing to examine MR. KAPLAN before, during and after the surgical procedure; in failing to diagnose the proper course of treatment for MR. KAPLAN; use reasonable care treating MR. KAPLAN; in failing to take all medically recommended precautions; in not performing all necessary tests; in negligently diagnosing MR. KAPLAN's condition and in otherwise being careless and negligent.

36. As a direct, proximate and foreseeable result of the violation of duty, negligence, wrongful and careless acts or omissions of the DEFENDANTS in failing to properly diagnose and treat MR. KAPLAN, in the scope of their authority, MR. KAPLAN was rendered sick, sore and disabled and was caused great pain, inconvenience, mental and physical agony, suffered and still suffers and will continue to suffer great physical pain, inconvenience, mental and physical agony, and has suffered and sustained serious and permanent injuries, and has thereby been damaged in an amount in excess of $100,000.

37. If DEFENDANTS had used reasonable care in the performance of their treatment, MR. KAPLAN would not have sustained serious and permanent injury.

38. MR. KAPLAN was free from negligence.

39. By reason of the foregoing, MR. KAPLAN was obligated to and did spend sums of money in endeavoring to cure and regain his health.

40. Defendants' acts demonstrated willful, wanton or malicious misconduct, and these actions caused Plaintiffs' injuries, and/or caused or contributed to the damages claimed by Plaintiffs herein, entitling Plaintiffs to punitive damages in such

sum as will serve to punish defendants and to deter defendants and others from like conduct.

Wherefore upon Count I, Plaintiffs pray judgment in their favor and against Defendants jointly and severally, in an amount in excess of $100,000, for punitive damages in such sum as will serve to punish Defendants and to deter Defendants and others from like conduct, for their costs, expenses and attorneys fees incurred herein and for such other and further relief as the Court deems just and proper.

### COUNT II: LOSS OF CONSORTIUM, COMPANIONSHIP, ASSOCIATION AND SUPPORT

41.   PLAINTIFFS' repeat and reallege each and every allegation in paragraphs 1 through 40 with the same force and effect as though fully set forth herein.

42.   At all times herein, MR. KAPLAN and MRS. KAPLAN were husband and wife, and as a spouse, MRS. KAPLAN was entitled to the services and society of the injured MR. KAPLAN and was responsible for the care, maintenance and medical expenses of the injured MR. KAPLAN.

43.   As a direct and proximate result of the injury to MR. KAPLAN, MRS. KAPLAN was deprived of the services and society of a spouse, suffered from psychological and emotional distress, anxiety, and loss of companionship, and did expended money for expenses, and was thereby damaged in an amount in excess of $100,000.

44.   Defendants' acts demonstrated willful, wanton or malicious misconduct, and these actions caused Plaintiffs' injuries, and/or caused or contributed to the damages claimed by Plaintiffs herein, entitling Plaintiffs to punitive damages in such

sum as will serve to punish defendants and to deter defendants and others from like conduct.

Wherefore upon Count II, Plaintiffs pray judgment in their favor and against Defendants jointly and severally, in an amount in excess of $100,000, for punitive damages in such sum as will serve to punish Defendants and to deter Defendants and others from like conduct, for their costs, expenses and attorneys fees incurred herein and for such other and further relief as the Court deems just and proper.

## COUNT III: BREACH OF CONTRACT

45.   PLAINTIFFS' repeat and reallege each and every allegation in paragraphs 1 through 44 with the same force and effect as though fully set forth herein.

46.   On or about August 5, 2003, MR. KAPLAN wrote to DR. NAGORNEY who was the surgeon employed by MAYO assigned to MR. KAPLAN, wherein MR. KAPLAN explained his concerns about PATHOLOGY REPORT 1 and drawing DR. NAGORNEY's attention to the weakness of the diagnostic statement as well as his prior history which might have explained his condition.

47.   MR. KAPLAN later spoke with DR. NAGORNEY and understood that DR. NAGORNEY was aware of his concerns over the weakness of the diagnostic statement that he had cancer. DR. NAGORNEY, both individually and on behalf of MAYO, promised MR. KAPLAN that he would insure that he and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise.

48.   Upon information and belief, notwithstanding MR. KAPLAN's letter of concern and warning, DR. NAGORNEY, both individually and on behalf of MAYO, did not communicate MR. KAPLAN's concerns to his colleagues at MAYO, did not insist that MAYO perform its own biopsy, or create it's own slides from the specimens

provided to DR. BURGART by DR. JOHNSON or take any of the other steps that MR. KAPLAN was told that DR. NAGORNEY and MAYO would take to insure that the diagnosis of his condition was correct.

49. MR. KAPLAN and DR. NAGORNEY, both individually and on behalf of MAYO, had a definitive agreement that DR. NAGORNEY and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise.

50. MR. KAPLAN, DR. NAGORNEY, and MAYO made this agreement with the intention to be bound to the terms of the agreement.

51. As good and valuable consideration in support of the contract between MR. KAPLAN, DR. NAGORNEY, and MAYO, MR. KAPLAN authorized DR. NAGORNEY and his colleagues at MAYO to perform the WHIPPLE procedure, which DR. NAGORNEY and his colleagues at MAYO did perform.

52. As good and valuable consideration in support of the contract between MR. KAPLAN, DR. NAGORNEY, and MAYO, MR. KAPLAN paid DR. NAGORNEY and MAYO for their performance of the WHIPPLE procedure.

53. As good and valuable consideration in support of the contract between MR. KAPLAN, DR. NAGORNEY, and MAYO, DR. NAGORNEY and his colleagues at MAYO rendered services to on MR. KAPLAN on or about August 13, 2003.

54. DR. NAGORNEY and MAYO, without legal excuse, failed to perform under their contract with MR. KAPLAN in that DR. NAGORNEY, both individually and on behalf of MAYO, did not communicate MR. KAPLAN's concerns to his colleagues at MAYO, did not insist that MAYO perform its own biopsy, or create it's own slides from the specimens provided to DR. BURGART by DR. JOHNSON or take any of the other

11

steps that MR. KAPLAN was told that DR. NAGORNEY would take to insure that the diagnosis of his condition was correct.

55. DR. NAGORNEY'S, actions, both for himself individually and on behalf of MAYO, constituted a material breach of the contract between MR. KAPLAN, DR. NAGORNEY, and MAYO.

56. DR. NAGORNEY'S and MAYO'S breach of their contract with MR. KAPLAN, was a direct and proximate cause of the harm suffered by MR. KAPLAN that is addressed above.

Wherefore upon Count III, Plaintiffs pray judgment in their favor and against Defendants jointly and severally, in an amount in excess of $100,000, for their costs, expenses and attorneys fees incurred herein and for such other and further relief as the Court deems just and proper.

## COUNT IV: INFORMED CONSENT

57. PLAINTIFFS' repeat and reallege each and every allegation in paragraphs 1 through 56 with the same force and effect as though fully set forth herein.

58. On or about August 5, 2003, MR. KAPLAN wrote to DR. NAGORNEY who was the surgeon employed by MAYO assigned to MR. KAPLAN, wherein MR. KAPLAN explained his concerns about PATHOLOGY REPORT 1 and drawing DR. NAGORNEY's attention to the weakness of the diagnostic statement as well as his prior history which might have explained his condition.

59. MR. KAPLAN later spoke with DR. NAGORNEY and understood that DR. NAGORNEY was aware of his concerns over the weakness of the diagnostic statement that he had cancer. DR. NAGORNEY promised MR. KAPLAN that he would insure that

he and his colleagues at MAYO would that MAYO's pathology diagnosis would be exhaustive and precise.

60. Upon information and belief, notwithstanding MR. KAPLAN's letter of concern and warning, DR. NAGORNEY did not communicate MR. KAPLAN's concerns to his colleagues at MAYO, did not insist that MAYO perform its own biopsy, or create its own slides from the specimens provided to DR. BURGART by DR. JOHNSON or take any of the other steps that MR. KAPLAN was told that DR. NAGORNEY would take to insure that the diagnosis of his condition was correct.

61. DR. NAGORNEY obtained consent from MR. KAPLAN to perform the WHIPPLE procedure based on DR. NAGORNEY'S representations to MR. KAPLAN that he and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise.

62. Based on those representations, MR. KAPLAN consented to the WHIPPLE procedure performed by DR. NAGORNEY and his colleagues at MAYO.

63. On information and belief, DR. NAGORNEY'S representation that he and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise was false.

64. Because of this misrepresentation by DR. NAGORNEY (and possibly others) MR. KAPLAN was not fully informed of the risks attendant to the WHIPPLE procedure, was not properly informed as to his medical condition, was not properly informed of the consequences of remaining untreated, and was not properly informed of the alternatives to the proposed treatment.

13

65. For these reasons, MR. KAPLAN'S consent was not adequately informed to the point that he could provide his informed consent to DR. NAGORNEY (and possibly others) to perform the WHIPPLE procedure.

66. Had MR. KAPLAN known that DR. NAGORNEY'S representation that he and his colleagues at MAYO would insure that MAYO's pathology diagnosis would be exhaustive and precise was false, MR. KAPLAN would have refused the proposed treatment and insisted on additional pathology studies and/or selected some other option and/or form of treatment.

67. DR. NAGORNEY'S negligent performance of the WHIPPLE procedure, without MR. KAPLAN'S informed consent, was a direct and proximate cause of the harm suffered by MR. KAPLAN that is addressed *supra*.

68. Defendants' acts demonstrated willful, wanton or malicious misconduct, and these actions caused Plaintiffs' injuries, and/or caused or contributed to the damages claimed by Plaintiffs herein, entitling Plaintiffs to punitive damages in such sum as will serve to punish defendants and to deter defendants and others from like conduct.

Wherefore upon Count IV, Plaintiffs pray judgment in their favor and against Defendants jointly and severally, in an amount in excess of $300,000, for punitive damages in such sum as will serve to punish Defendants and to deter Defendants and others from like conduct, for their costs, expenses and attorneys fees incurred herein and for such other and further relief as the Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS demand judgment against the Defendants, jointly and severally on Count I in an amount in excess of $100,000.00 and for punitive

damages, on Count II in an amount in excess of $100,000.00 and for punitive damages, on Count III in an amount in excess $100,000.00, and on Count IV in an amount in excess of $300,000.00 and for punitive damages, for their costs, expenses and attorneys fees incurred herein and for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs request a trial by Jury.

Respectfully submitted,

ELLIOT KAPLAN, Pro Se

Date: August 6, 2007

/s/ Elliot Kaplan
Elliot Kaplan
2620 West 171st Street
Stillwell, KS 66085
913-897-4436
913-897-4492
emk@elliotkaplan.com

JEANNE KAPLAN, Pro Se

Date: August 6, 2007

/s/ Jeanne Kaplan
Jeanne Kaplan
2620 West 171st Street
Stillwell, KS 66085
913-897-4436
913-897-4492
emk@elliotkaplan.com