# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ELLIOT KAPLAN and JEANNE KAPLAN, | Civil No. 07-3630 (JRT/JJK) |
| Plaintiffs, | |
| v. | |
| MAYO CLINIC, MAYO FOUNDATION, MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, MAYO ROCHESTER, INC., MAYO CLINIC ROCHESTER, INC., and LAWRENCE J. BURGART, | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR A NEW TRIAL** |
| Defendants. | |

James F. B. Daniels, **MCDOWELL, RICE, SMITH & BUCHANAN**, 605 West 47th Street, Suite 350, Kansas City, MO 64112; Thomas J. Ward, **WARD & WARD, PLLC**, 2020 North Street NW, Washington, DC 20036; Mark L. Johnson, **GREENE ESPEL PLLP**, 200 South Sixth Street, Suite 1200, Minneapolis, MN 55402-1415; and Robert A. Stein, **BOB STEIN LLC**, 10125 Crosstown Circle, Suite 200, Eden Prairie, MN 55344, for plaintiffs.

William R. Stoeri, Heather B. McCann, and Bartholomew B. Torvik, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498; and Joshua B. Murphy, **MAYO CLINIC LEGAL DEPARTMENT**, 200 1st Street S.W., Rochester, MN 55905, for defendants.

This case is before the Court on plaintiffs Elliot Kaplan ("Kaplan") and Jeanne

Kaplan's (collectively, "plaintiffs") motion for a new trial after a jury found that

defendants Mayo Clinic Rochester, Inc.[1] ("Mayo") and Dr. Lawrence Burgart (collectively, "defendants") were not liable for medical malpractice as a result of incorrectly diagnosing Kaplan with pancreatic cancer. For the reasons set forth below, the Court denies plaintiffs' motion.

## BACKGROUND

In July 2003, Kaplan was hospitalized in Missouri after experiencing severe abdominal pain. A CT scan showed that Kaplan had an enlarged pancreas, and doctors in Missouri proceeded to perform a needle biopsy on the pancreas. A pathologist affiliated with the Missouri hospital reviewed the biopsy and, based on that review, Kaplan was diagnosed with pancreatic cancer. In August 2003, Kaplan sought a second opinion from Mayo, and sent to Mayo pathology slides that the Missouri doctors had prepared in conjunction with the needle biopsy. Dr. Burgart, a Mayo pathologist, reviewed the pathology slides and diagnosed Kaplan with grade 2 infiltrating pancreatic cancer. Given Dr. Burgart's diagnosis, Dr. David Nagorney, a Mayo surgeon, recommended that Kaplan undergo a pancreatoduodenectomy, or "Whipple" procedure, which involves excising portions of the pancreas and stomach as well as the entire pylorus and duodenum. Kaplan chose to have the procedure performed at the Mayo Clinic in Rochester, Minnesota. On August 14, 2003, Dr. Nagorney performed the Whipple

---

[1] During the hearing on pre-trial motions, defendants represented to the Court – without objection from plaintiffs – that notwithstanding the current case caption, the appropriate corporate defendant is Mayo Clinic Rochester, Inc.

procedure on Kaplan. After examining the pancreatic tissue post-operatively, Mayo pathology determined that Kaplan did not in fact have pancreatic cancer.

Plaintiffs brought this action against Mayo and its affiliates and against Dr. Burgart, alleging claims for, *inter alia*, medical malpractice and breach of contract.[2] At the close of plaintiffs' case-in-chief during a jury trial, the Court granted defendants' motion for judgment as a matter of law on plaintiffs' breach of contract claim. On April 14, 2009, the jury returned a verdict in favor of defendants on the remaining medical malpractice claim. (*See* Docket No. 166.) On April 30, 2009, plaintiffs filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a).

## DISCUSSION

## I. STANDARD OF REVIEW FOR MOTION FOR NEW TRIAL

Under Rule 59(a) of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial "on all or some of the issues." Fed. R. Civ. P. 59(a)(1). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence . . . or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). "The authority to grant a new trial is within the discretion of the district court." *Id.*

To conclude that a jury verdict was against the weight of the evidence, the Court "must find that the jury's verdict was against the great, clear, or overwhelming weight of

---

[2] Plaintiffs' claims against the Mayo surgeon, Dr. Nagorney, were dismissed in the Court's summary judgment order of October 27, 2008. (Docket No. 87.)

the evidence." *Frumkin v. Mayo Clinic*, 965 F.2d 620, 624 (8th Cir. 1992) (internal quotation marks omitted). The Court may also grant a new trial where improper evidentiary rulings "had a substantial influence on the jury's verdict," *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (internal quotation marks omitted), and the admission of evidence was "so prejudicial that a new trial would likely produce a different result," *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002). With regard to challenged jury instructions, the pertinent question is "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and accurately submitted the issues to the jury. . . . [A] new trial is necessary only when the errors misled the jury or had a probable effect on the jury's verdict." *Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, 460 F.3d 1047, 1054 (8th Cir. 2006).

Plaintiffs do not substantively argue, and the Court does not find, that the jury's verdict was "against the great, clear, or overwhelming weight of the evidence." *See Frumkin*, 965 F.2d at 624 (internal quotation marks omitted). The Court thus turns to plaintiffs' arguments that a new trial is warranted because the Court erred in admitting or excluding certain evidence, failed to properly instruct the jury, and improperly granted Mayo's motion for judgment as a matter of law on plaintiffs' breach of contract claim.

## II.  THE ADMISSION OF PHOTOMICROGRAPHS OF BIOPSY SLIDES DOES NOT WARRANT A NEW TRIAL.

Plaintiffs argue that the Court erred in admitting into evidence thirty photographs of Kaplan's biopsy slides, which Dr. Burgart and defendants' expert witness, Dr. Joel Greenson took in preparation for trial. Specifically, plaintiffs argue that Mayo did not

establish that there was a reasonable probability that those photographs were of biopsy slides of tissue taken from Kaplan prior to his surgery; that Mayo failed to provide a "chain of custody affidavit" for the biopsy slides; and that Mayo failed to produce many of the photographs prior to the exchange of trial exhibits. Plaintiffs further contend that to the extent that the Court conditionally admitted the photographs, it erred by not instructing the jury of its responsibility to determine that such evidence was authentic.

### A. The Court Did Not Err in Admitting the Photomicrographs into Evidence.

Plaintiffs challenge the authenticity of the photographs admitted in defendants' Exhibit 13. They note that Dr. Greenson and Dr. Burgart's photographs were of biopsy slides that defendants in a parallel Missouri litigation sent directly to Mayo prior to the doctors' photographing of the slides. Plaintiffs argue that they "have no idea what [the Missouri defendants'] counsel sent [to Dr. Burgart and Dr. Greenson], . . . what Mayo received, . . . the condition of the slides, or, indeed, the 'subject matter' of the slides." (Am. Mem. in Supp. at 15, Docket No. 176.) Plaintiffs assert that there is a "very real possibility that the tissue slides had been 'switched', unmounted, altered or substituted by one of the many, many hands into and through which the slides passed." (*Id.* at 13.)

The Court concludes that the admission of the photomicrographs was not erroneous. Plaintiffs' assertions are premised on little more than speculation and an assumption that because the one-time custodians of the original biopsy slides – that is, counsel for the Missouri defendants – "would be keen to avoid liability for the Kaplan's injuries," there is a reasonable likelihood that they would manipulate the original slides.

(Am. Mem. in Supp. at 17, Docket No. 176.)  Plaintiffs' arguments, however, are not based in fact and suggest only the general possibility that the Missouri defendants' counsel **could** have altered the slides.  Moreover, Mayo elicited substantial testimony during trial to provide foundation for the photographs.

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication . . . as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  Fed. R. Evid. 901(a). Such evidence may be presented in the form of, *inter alia*, testimony of a witness with knowledge "that a matter is what it is claimed to be," and a comparison "by expert witnesses with specimens which have been authenticated."  Fed. R. Evid. 901(b)(1), (3). Here, Dr. Burgart testified that he took the photographs in January 2009, immediately after the Magistrate Judge ordered **plaintiffs** to deliver the biopsy slides to Mayo.  In other words, counsel for the Missouri defendants did not send those slides directly to Mayo, and plaintiffs had the opportunity to examine the slides before Mayo received them.  Further, Mayo's witness, Dr. Thomas Smyrk, compared the photographs of the biopsy slides taken by plaintiffs' expert witness Dr. Barry Shmookler with the photographs taken by Dr. Greenson and Dr. Burgart, and concluded that they were of the same general area of pancreatic tissue and were of the same original biopsy slide.  (*See* Tr. of Dr. Smyrk's Testimony, 13:18-14:9; *see also* Tr. of Dr. Greenson's Testimony at 16:9-18:19.)  Dr. Smyrk testified that it would not be possible to alter a biopsy slide by opening the slide and adding cancer cells without the alteration being recognizable.  (*Id.*

at 14:10-13.) That testimony was sufficient to provide foundation for the photographs admitted in defendants' Exhibit 13.

Plaintiffs also contend that Mayo failed to satisfy a condition precedent to the admissibility of the photomicrographs because Mayo did not provide an affidavit from the defense counsel in the Missouri litigation – which plaintiffs contend would resolve the authentication dispute – regarding the chain of custody of the biopsy slides while they were in the Missouri defendants' counsels' possession. Plaintiffs, however, misconstrue the Court's rulings on their objections. The Court denied plaintiffs' motion *in limine* to exclude the photomicrographs, while noting that Mayo would still need to provide appropriate foundation for the photographs at they time they were introduced. When plaintiffs renewed their objection to the admission of the photographs at trial in a side-bar with the Court, the Court reiterated that it would admit the photographs "on the representation that the foundation will be laid appropriately through the witnesses who actually took the pictures." (Tr. at 4:8-11, Docket No. 173, Ex. 1.) The Court also noted that plaintiffs had premised their objections on "speculation," and that a chain of custody document was unnecessary. (*Id.* at 10:4-6.) The Court concluded, "Unless we find something that is amiss in the slides, we're going to go through it and lay as much foundation as you can with this witness, and we'll tie it up with the other witnesses." (*Id.* at 10:6-9.) The Court did not admit the photographs conditionally, but merely reiterated that Mayo would have to provide foundation for the photographs, as required under the Federal Rules of Evidence. Mayo elicited adequate testimony from Dr. Burgart, Dr. Smyrk, and Dr. Greenson to provide foundation for the photographs.

Further, Mayo's failure to provide an affidavit from the Missouri defense counsel regarding chain of custody is of little relevance. The Court concluded that such a document was unnecessary, and Mayo's statement at the close of the side-bar that it would supply that affidavit was not made pursuant to any directive or request from the Court.

As to plaintiffs' suggestion that the photographs should have been excluded because they were not provided during discovery, the Court previously denied plaintiffs' motion *in limine* to that effect and the Court finds no reason to depart from that conclusion now. Plaintiffs concede that Dr. Greenson's photographs were disclosed to them within the expert discovery deadline, and plaintiffs cannot now argue surprise relating to Dr. Burgart's photographs where the Magistrate Judge previously issued an order compelling plaintiffs to produce the biopsy slides so that Dr. Burgart could take those photographs prior to trial. (*See* Docket Nos. 97, 99.)

Finally, even if the Court were to conclude that it erred in admitting the photographs, plaintiffs were not prejudiced by the admission of the evidence at trial. Dr. Burgart testified that photographs taken by **plaintiffs' expert**, Dr. Shmookler, and introduced into evidence by **plaintiffs** supported Dr. Burgart's cancer diagnosis.

In short, the admission of Dr. Greenson and Dr. Burgart's photographs of biopsy slides in Exhibit 13 was not in error, and there was a substantial basis for Dr. Burgart's testimony such that any alleged error did "not affect the substantial rights of the parties." *Norton v. Caremark, Inc.*, 20 F.3d 330, 338-39 (8th Cir. 1994) (internal quotation marks

omitted).   Accordingly, the Court denies plaintiffs' motion for a new trial on those grounds.

**B.    The Court Did Not Err by Not Instructing the Jury Relating to Conditional Relevancy.**

Plaintiffs argue that "assuming, *arguendo*, that the Court intended to admit the microphotographs . . . conditionally, with the expectation that the jury itself would make the final determination as to whether," the photographs were authentic, the Court erred by "fail[ing] to instruct the jury that it was entitled and expected to make that determination."  (Am. Mem. in Supp. at 18, Docket No. 176.)  Federal Rule of Evidence 104(b) provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition."  Fed. R. Evid. 104(b).  As one federal court noted:

> The judge makes a preliminary determination whether the foundation evidence is sufficient to support a finding of fulfillment of the condition.  If so, the item is admitted.  If after all the evidence on the issue is in, pro and con, the jury could reasonably conclude that fulfillment of the condition is not established, the issue is for them.  If the evidence is not such as to allow a finding, the judge withdraws the matter from their consideration.

*United States v. Stephens*, 202 F. Supp. 2d 1361, 1367 (N.D. Ga. 2002) (quoting Fed. R. Evid. 104 advisory committee's note).

At trial, the Court stated in a side-bar addressing plaintiffs' objections, "I'm going to go ahead and let them put in the slides he worked with, and if there is a problem, we will instruct the jury accordingly."  (Tr. at 10:15-17.)  The Court, however, did not

- 9 -

conditionally admit the photographs into evidence. In fact, the Court explicitly denied plaintiffs' motion *in limine* to exclude the photographs. Moreover, when addressing plaintiffs' objections at trial, the Court reiterated that a chain of custody document was unnecessary and that Mayo simply would need to provide foundation for the photographs. Thus, the Court merely reiterated a common evidentiary precept, the requirements of which Mayo satisfied through subsequent testimony at trial.[3]

## III. THE COURT DID NOT ERR IN ADMITTING THE UNREDACTED DUNLAP FILE.

Plaintiffs contend that the Court erred in admitting into evidence an unredacted office file of Dr. John Dunlap, Kaplan's referring physician in Kansas. Specifically, plaintiffs argue that the office file included numerous references to "collateral sources," and that submitting that evidence to the jury violated Minnesota Statute § 548.251. Section 548.251 provides that "[t]he jury shall not be informed of the existence of collateral sources or any future benefits which may or may not be payable to the plaintiff." Minn. Stat. § 548.251 subd. 5. Under the statute, "'collateral sources' [are] payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to . . . health [or] accident and sickness . . . insurance." *Id.* subd. 1(2).

Plaintiffs argue that the prohibition on informing the jury of "collateral sources" refers to more than actual payments from the entities listed in subdivision 1 of the statute,

---

[3] Notably, plaintiffs did not move for a jury instruction relating to conditional relevance at trial and first raised this challenge to the jury instructions in their motion for a new trial.

and includes mere references to the potential payors of those benefits.  Further, plaintiffs

argue that "each of the references to disability insurance benefits, health insurance

benefits, Medicare benefits and social security disability benefits that appear in

Dr. Dunlap's file represent evidence of 'future benefits which may or may not be payable

to' the Kaplans and should have been excluded on that ground alone."  (Am. Mem. in

Supp. at 24, Docket No. 176 (quoting Minn. Stat. § 548.251 subd. 5).)  Finally, plaintiffs

argue that the Court erred by declining to instruct the jury to disregard any references to

collateral sources.  The Court disagrees.

Plaintiffs argue that the effect of the submission to the jury of the unredacted

Dunlap file with references to disability and health insurance benefits could have led the

jury to determine that plaintiffs "were already 'well taken care of.'"  (Am. Mem. in Supp.

at 24, Docket No. 176).  Indeed, as plaintiffs point out, in *Moses v. Union Pacific*

*Railroad*, the Eighth Circuit stated that "a plaintiff's collateral sources of compensation

cannot be inquired into as part of a defendant's case, because of the danger that the jury

may be inclined to find no liability, or to reduce a damage award, when it learns that

plaintiff's loss is entirely or partially covered."  64 F.3d 413, 416 (8th Cir. 1995).  In

*Moses*, the defendant's counsel questioned the plaintiff's witness on cross-examination

about the plaintiff's worker's compensation insurance and the coverage limits for that

insurance.  *Id.*  During closing arguments, defense counsel asserted that the worker's

compensation insurance company encouraged the filing of the plaintiff's personal injury

suit to recover "medical expenses" and "lost wages."  *Id.*  Plaintiffs also cite *Kasuske v.*

*Rothers Constr., Inc.*, No. C0-00-1489, 2001 WL 410731, at *1, 4 (Minn. Ct. App. Apr.

24, 2001), where the Minnesota Court of Appeals held that the introduction of collateral sources into evidence – i.e., evidence of a stipulated-to worker's compensation settlement of $6,000 – violated § 548.251 and prejudiced the plaintiff. The court of appeals stated, "There is no way to rule out the possibility that the net effect of the evidence left the jury with the impression that appellant had been adequately compensated for both his injuries **and** for his wrongful termination." *Id.* at \*4.

The instant case is distinguishable. The Minnesota statute specifically defines "collateral sources" as "**payments** . . . made to the plaintiff . . . pursuant to . . . health [or] accident and sickness . . . insurance." Minn. Stat. § 548.251 subd. 1(2) (emphasis added). Plaintiffs, however, do not identify any references in the Dunlap file to payments or benefits provided by insurance companies or similar entities.[4] The statutory language defines the term "collateral source" narrowly, as "payments," and there is no support in Minnesota law for plaintiffs' argument that the mere reference to the existence of insurance or potential benefit-payors violates the collateral source rule. Similarly, plaintiffs' contention that the Dunlap file refers to "future benefits" is unpersuasive. Again, the mere mention of the existence of an insurance company or some other entity identified in subdivision 1 does not signal that future benefits are or even could be forthcoming.

---

[4] The Court initially granted plaintiffs' motion *in limine* to the extent that plaintiffs sought to prevent defendants from referencing any **payments** from subdivision 1 sources. (*See* Docket Nos. 139, 156.)

Moreover, the correspondence between Dr. Dunlap and Kaplan's insurers is relevant to plaintiffs' medical malpractice claims, as that correspondence detailed Dr. Dunlap's description of Kaplan's injuries as caused by acute pancreatitis, not by the Whipple procedure. At trial, however, Dr. Dunlap testified that Kaplan's injuries were caused by the Whipple procedure. The Court's exclusion of the correspondence in the Dunlap file would have therefore prejudiced defendants by limiting their opportunity to impeach Dr. Dunlap.

In sum, the Court's admission of the unredacted Dunlap file was not in error because the references in that file to Kaplan's insurance carrier, Medicare coverage, or the availability of Social Security Disability benefits, alone, do not fall within the ambit of § 548.251. Further, any instruction to the jury to disregard collateral sources would have risked unnecessarily highlighting the issue of collateral sources. Accordingly, the Court denies plaintiffs' motion for a new trial on these grounds.

## IV. JURY INSTRUCTION 13 FAIRLY AND ADEQUATELY SUBMITTED THE ISSUES IN THE CASE TO THE JURY.

Plaintiffs argue that the Court erred by failing to include Dr. Burgart's name in Instruction 13, which identifies the factual elements of a medical negligence claim. Specifically, plaintiffs argue that the omission of Dr. Burgart's name from the instruction prevented the jury from finding Dr. Burgart separately liable without running afoul of the Court's other instructions. In Instruction 13, the Court instructed the jury:

> The plaintiffs have brought a medical negligence action, which is sometimes referred to as medical malpractice. The plaintiffs have alleged that the defendants were negligent in providing professional health care to

Elliot Kaplan and that the defendants' negligence was a direct cause of injury and harm to the plaintiffs. In order to prevail on the medical negligence claim, the plaintiffs must show by a preponderance of the evidence:

*First*, that **Mayo Clinic Rochester** doctors deviated from the standard of skill and learning ordinarily possessed and exercised by doctors in good standing under similar circumstances; and

*Second*, that such deviation directly caused injury and damage to the plaintiffs.

(Jury Instructions, Instruction No. 13, Docket No. 164 (emphasis added).)

Under Federal Rule of Civil Procedure 49, if the Court requires the jury to return a special verdict form, as it did here, "[t]he court must give the instructions and explanations necessary to enable the jury to make its findings on each submitted issue." Fed. R. Civ. P. 49(a)(2).

Plaintiffs first raised this objection in their motion for a new trial. That is, even though plaintiffs had an opportunity to do so, they did not object to Instruction 13's content during the formal charge conference or at any other time at or before trial. Thus, plaintiffs did not raise the issue with the Court at a time when the Court could remedy the alleged problem. Notwithstanding plaintiffs' failure to object before the jury was instructed, however, the instructions fairly and adequately submitted the issues to the jury.

In reviewing a challenge to jury instructions in a motion for a new trial, "the pertinent query is whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Horstmyer v. Black & Decker, (U.S.), Inc.*, 151 F.3d 765, 771 (8th Cir. 1998). In

- 14 -

short, plaintiffs argue that the failure to specifically refer to Dr. Burgart in Instruction 13 resulted in a failure to submit to the jury the issue of Dr. Burgart's negligence. (Am. Mem. in Supp. at 26-27, Docket No. 176.) Plaintiffs assert that the "only explanation and instruction appearing in Instruction 13 and thus the only guidance given to the jury in the Special Verdict Form is an instruction as to the medical negligence of 'Mayo Clinic Rochester doctors.'" (*Id.* at 27.) Plaintiffs argue that "there was no way [the jury] could ever return a verdict against 'Lawrence Burgart' simply because his negligence was never submitted in Instruction 13 as the Verdict Form requires." (*Id.* (internal quotation marks and emphasis omitted).)

The issue of Dr. Burgart's negligence was properly and clearly submitted to the jury. Plaintiffs do not contend that the Instruction 13 was legally inaccurate, and the Court cannot conclude that the instruction would be confusing to the jury or would inhibit the jury's ability to make findings on the issue of Dr. Burgart's negligence. Instruction 13 refers to "Mayo Clinic Rochester doctors," one of whom is Dr. Burgart. (*See also* Jury Instructions, Instruction No. 12, Docket No. 164 ("Mayo Clinic Rochester is a corporation. It can act only through its doctors, nurses, and other employees.").) The Special Verdict Form, which asks "Were **Mayo Clinic Rochester and/or Lawrence Burgart** negligent in the care and treatment of Elliot Kaplan, **as submitted in Instruction 13**?", (Docket No. 166), clearly provides that the jury may find that **either** Mayo or Dr. Burgart was negligent. Jury Instruction 15 mirrors the Special Verdict Form's language, stating, "The fact that Plaintiffs claim that an injury occurred does not by itself mean that **Mayo Clinic Rochester and/or Lawrence Burgart** were negligent."

(Jury Instructions, Instruction No. 15, Docket No. 164 (emphasis added).) In these circumstances, the issue of Dr. Burgart's negligence was therefore properly and clearly submitted to the jury, and the Court accordingly denies plaintiffs' motion to the extent it is based on these grounds.

## V. THE COURT DID NOT ERR BY NOT ALLOWING PLAINTIFFS TO READ DR. BURGART'S DEPOSITION TESTIMONY INTO THE RECORD.

Plaintiffs contend that the Court erred by refusing to admit into evidence portions of Dr. Burgart's deposition testimony.

As an initial matter, it is not clear to the Court what "error" plaintiffs assert that the Court committed regarding Dr. Burgart's deposition testimony. During a hearing on pre-trial motions, plaintiffs represented to the Court that they did not intend to call Dr. Burgart as a witness by deposition testimony, and only intended to use the deposition testimony as admissions against interest and potentially for impeachment purposes. The Court agreed that such use of Dr. Burgart's deposition testimony was proper under Rule 32. *See* Fed. R. Civ. P. 32(a)(2); Fed. R. Evid. 801(d)(2). Plaintiffs did not represent to the Court at the pre-trial hearing that they would seek to admit entire portions of the deposition testimony into the record at trial and, based on considerations of efficiency, the Court granted defendants' motion *in limine* to preclude plaintiffs from doing so. Plaintiffs represented to the Court that they would limit their use of the deposition testimony, and now, after an unfavorable verdict, assert that the Court erred in permitting plaintiffs to limit that use.

Moreover, the Court appropriately granted defendants' motion *in limine*: reading Dr. Burgart's deposition testimony into evidence would have been duplicative and unnecessary given Dr. Burgart's availability to offer live testimony. *See* Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by . . . considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). Further, plaintiffs have not demonstrated that the Court's ruling prejudiced them. Plaintiffs did not call Dr. Burgart to testify at trial, despite subpoenaing Dr. Burgart to testify and asserting that, "[f]rom the Kaplans' perspective, Burgart was the prime mover of the malpractice that occurred in this case." (Am. Mem. in Supp. at 30, Docket No. 176.) Defendants eventually called Dr. Burgart, and plaintiffs had ample opportunity to cross-examine him and introduce his prior deposition testimony for the purposes of impeachment.

In sum, the Court finds that it did not err in granting defendants' motion *in limine* or otherwise denying plaintiffs' request to read Dr. Burgart's deposition testimony into the record and accordingly, the Court denies plaintiffs' motion to that extent.

## VI.    THE COURT DID NOT ERR IN GRANTING DEFENDANTS JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' BREACH OF CONTRACT CLAIM.

Plaintiffs argue that the Court improperly granted defendants' motion for judgment as a matter of law on plaintiffs' breach of contract claim at the close of plaintiffs' case-in-chief. Federal Rule of Civil Procedure 50 provides that the Court may grant a party's motion for judgment as a matter of law before the case is submitted to the

jury if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [opposing] party on that issue." Fed. R. Civ. P. 50(a).

The precise contours of plaintiffs' breach of contract claim remain somewhat unclear. The claim has been characterized as "Mayo's failure to perform its own biopsy and otherwise properly diagnose Kaplan," (Order at 9, Docket No. 87); Mayo's failure to conduct an exhaustive and precise determination of whether Kaplan had cancer, (Pls.' Statement of the Case at 19, Docket No. 116); and Mayo's breach of a promise to Kaplan to conduct an intraoperative biopsy of his pancreas.[5]

At summary judgment, the Court concluded that plaintiffs' breach of contract claim was derivative of the medical malpractice claim, required plaintiffs to provide an expert affidavit supporting that claim, and stated that the Kaplans would have to provide "expert testimony" as to Mayo's negligence to establish that claim. (Order at 9, Docket No. 87 ("The Court also finds that the Kaplans' remaining state law claims are derivative of the medical malpractice claim and, therefore, similarly require expert testimony as to Mayo's alleged negligence.").) The Court concludes that at trial, plaintiffs were required to prove their breach of contract claim, and specifically causation, with expert evidence. *See Fabio v. Bellomo*, 504 N.W.2d 758, 762 (Minn. 1993) ("To make out a prima facie case of causation in medical malpractice against [defendant], [plaintiff] must present

---

[5] In plaintiffs' memorandum in support of the motion for a new trial, plaintiffs roughly describe the claim in rejecting defendants' argument that they needed to offer an expert opinion "to show that cancer would have been detected had [defendants] performed additional tests, including the intra-operative 'biopsy' of Elliot's pancreas, and the pathologic examination thereof 'by frozen section' which, through Dr. Nagorney, they had promised to do." (Am. Mem. in Supp. at 31, Docket No. 176.)

expert testimony that establishes that it is more probable than not that damages resulted from his malpractice.")  That is, the question of whether a defendant's alleged breach of a duty caused harm to Kaplan did not "fall within an area of common knowledge or lay comprehension."  *See Chizmadia v. Smiley's Point Clinic*, 965 F.2d 647, 648 (8th Cir. 1992) (applying Minnesota law).

There was no evidence presented at trial such that a reasonable jury member could conclude that Mayo was liable to Kaplan for breach of contract and that such breach caused Kaplan harm.  Plaintiffs' expert Dr. Shmookler did not offer testimony on the standard of care, such as whether Dr. Nagorney should have biopsied Kaplan's pancreas during surgery or whether Dr. Nagorney should have created additional slides from the intraoperative biopsy for pathology review.  More importantly, Dr. Shmookler did not opine that a failure to take those steps, or that a breach of **any** duty to Kaplan, caused Kaplan harm.  It is highly questionable that Dr. Shmookler **could** have offered such opinions, given that Dr. Shmookler is a pathologist and is likely unqualified to offer opinions relating to the standard of care underlying the breach of contract claim.

The Court also notes that defendants' experts' testimony did not establish causation.  Dr. Nagorney testified that he does not conduct intraoperative biopsies of the pancreas when there is a pre-surgery cancer diagnosis.  (Tr. of Dr. Nagorney's Testimony, 248:23-249:5.)  Dr. Nagorney also testified that even if he had performed an intraoperative biopsy of Kaplan's pancreas and that biopsy had tested negative for cancer, he would have continued with the surgery because, *inter alia*, (1) there was a preoperative cancer diagnosis; and (2) a "permanent section" biopsy slide, taken during a

preoperative needle-biopsy, is more reliable and accurate than "frozen section" biopsy slides taken during intraoperative biopsies. (Tr. of Dr. Nagorney's Testimony, 219:24-223:9.)

In short, plaintiffs adduced no expert evidence at trial establishing causation relating to the breach of contract claim as alleged here. Accordingly, judgment as a matter of law in favor of defendants was appropriate.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that plaintiffs' Motion for a New Trial [Docket No. 170] is **DENIED.**

DATED:  April 20, 2010                    ____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                          United States District Judge